883 P.2d 1269

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Nena VALLEJOS, Defendant–Appellant.**

**No. 20710.**

Supreme Court of New Mexico.

Sept. 30, 1994.

Rehearing Denied Oct. 27, 1994.

Sammy J. Quintana, Chief Public Defender, David Henderson, Asst. Appellate Defender, Santa Fe, for appellant.

Tom Udall, Atty. Gen., Margaret McLean, Asst. Atty. Gen., Santa Fe, for appellee.

## OPINION

MONTGOMERY, Chief Justice.

This case involves the subject of "use," or "derivative use," immunity granted to a witness compelled to testify at a hearing or other proceeding when the witness is also accused of a crime and therefore entitled to the protection afforded by the privilege against self-incrimination. We discussed the subject in *State v. Munoz*, 103 N.M. 40, 702 P.2d 985 (1985), in which we adopted the principles outlined in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (upholding constitutionality of federal use immunity statute). In *Munoz* we cautioned:

> "[I]t is the government's heavy burden to prove the negative in [these] case[s]; *i.e.*, that none of its evidence suffers from taint. The government might find this to be an unreasonable or impossible burden. The government must however recognize that it, in its sole discretion, determines to whom it will grant immunity in order to convict others. The government must recognize that where it grants immunity, it runs the *grave risk* that any future prosecution of such an immunized witness for past or continuing crimes may, as a practical matter, be impossible...."

103 N.M. at 45, 702 P.2d at 990 (quoting *United States v. Hossbach*, 518 F.Supp. 759, 773 (E.D.Pa.1980) (emphasis added) (alteration in original)).

In the present case the government chose to run this grave risk by compelling Defendant–Appellant, Nena Vallejos, to testify at another defendant's preliminary hearing. The other defendant then testified as a witness at Vallejos's trial. She was convicted of first degree (felony) murder and armed robbery. She appeals these convictions on various grounds, including the one discussed in this opinion: that the State's derivative use of her immunized testimony violated her privilege against self-incrimination. We agree with her position, reverse her convictions, and take the opportunity to develop the guidelines first enunciated in *Munoz*.

I.

In April 1991 unknown assailants stabbed Wesley Elmo Stockard to death at his residence in Roswell, New Mexico. Police offi-

cers investigating the murder received a "crimestopper's tip" implicating a thirteen-year-old girl in the crime. The young woman told police that she and her aunt had given Nena Vallejos, Dora Matta, and Mario Acosta a ride to a house on the west side of town sometime in April and that Vallejos, Matta, and Acosta had gone inside and returned about ten minutes later.

The day after the young woman made her statement, Matta called the police and told them she had been involved in the Stockard murder. She was taken to the police station, where she said that she and Vallejos had killed Stockard. She told police that she and Vallejos had been drinking when Vallejos came up with the idea of getting some money from Stockard. After they arrived at Stockard's house, a fight ensued. Matta struck Stockard several times about the head and chest with a garden tool and Vallejos stabbed him three or four times in the chest with a kitchen knife.

In July 1991 the police interviewed Acosta about his involvement in the murder. During this interview Acosta informed police that he had driven to a house with Vallejos, Matta, and another woman. He said that Vallejos and Matta had gone into the house and that he had waited in the car for fifteen or twenty minutes until they returned. He told police that when Vallejos returned to the car she had several hundred dollars, a small television set, and a .22 caliber rifle.

The police arrested Vallejos in October 1991. Later that month Acosta testified at her preliminary hearing under an immunity order. At the hearing, Acosta testified that he went with Vallejos and Matta to Stockard's house but that he was passed out drunk in the back of the car and saw nothing. Thus, by his testimony Acosta attempted to exculpate himself from criminal liability for Stockard's murder.

Acosta was arrested in March 1992. On April 7 Vallejos testified at his preliminary hearing—in his presence of course—under an immunity order. We assume—although the assumption is not significant in our analysis—that her testimony was consistent with the testimony she gave at her trial three weeks later, placing Acosta in Stockard's house at the time of the murder.[1] Two weeks after Acosta's preliminary hearing the court held a hearing on a motion by Vallejos to disqualify the district attorney's office from prosecuting her.

At the motion hearing—a so-called "*Kastigar* hearing"—Vallejos argued that the State might use against her at her forthcoming trial the information received from her immunized testimony at Acosta's preliminary hearing. The prosecutor, Charles Plath, "certified" that all evidence to be provided at trial had been obtained before the preliminary hearing. Plath then had his employer, District Attorney Tom Rutledge, testify concerning the procedures used to ensure that Vallejos's immunized testimony would not be used against her. Rutledge testified that he had appointed separate prosecutors for each of the three defendants (Vallejos, Matta, and Acosta) and described the "Chinese Wall" put in place to insulate the immunized testimony of any defendant from the prosecutor who was in charge of prosecuting that defendant's case.

Plath also had the two investigating officers in the case testify that they did not hear any of the defendants' immunized testimony at the preliminary hearings. Based on this evidence, the court ruled that appropriate precautions had been taken to ensure that there had been and would be no improper use of Vallejos's immunized testimony and denied her motion. The motion to disqualify the district attorney's office was renewed a week later and again denied.

Vallejos's trial began May 1, 1992. Acosta testified as follows: He went into Stockard's house with Vallejos and Matta. Vallejos asked Stockard for money, which he (Stock-

---

1. The transcript of Acosta's preliminary hearing is not part of the record on appeal. We think it reasonable to assume that Vallejos's testimony at Acosta's preliminary hearing was consistent with her testimony at her trial implicating Acosta; the State has not asserted on appeal that her testimony at the hearing was in any way inconsistent with her testimony at trial.

ard) refused to provide; eventually he ordered them out of his house. Matta went outside and got a rake and then returned and began beating Stockard with the rake until he fell to the floor. After Stockard fell, Vallejos went into the kitchen, got a knife, and came back and began stabbing him. In this way, Acosta's testimony inculpated Vallejos in the murder.

Matta similarly repudiated at Vallejos's trial her earlier statement to the police. She testified that she had gone to Stockard's house with Vallejos and Acosta to borrow money to buy more alcohol. While they were at Stockard's house, Vallejos and Stockard began struggling and Matta hit Stockard in the chest with a flower pot to make him let go of Vallejos. Matta, Vallejos, and Acosta then left Stockard's house. Matta's earlier statement was introduced into evidence as a prior inconsistent statement. Asked why she had changed her story, Matta testified that she did not recall telling the police that Vallejos had stabbed Stockard and explained that she had been drunk and "under a lot of pressure" at the time she made the statement.

Vallejos testified in her own behalf. She said that she, Matta, and Acosta had gone to Stockard's house with the intention of borrowing money. Stockard refused to lend them money and asked them to leave, whereupon Matta and Acosta began beating Stockard. Vallejos said that she then left the house, that Matta and Acosta came out later, and that she did not see who stabbed Stockard.

The jury convicted Vallejos of felony murder and armed robbery. She appeals her convictions on numerous grounds, contending primarily that the court erred in ruling that the State had made an adequate showing that her immunized testimony had not been used against her. We agree and reverse her

convictions, holding that the State's use of her immunized testimony at her trial violated her Fifth Amendment privilege against compelled self-incrimination. Our holding makes it unnecessary to address her remaining assertions of error.

## II.

■ The Fifth Amendment to the United States Constitution guarantees that "[no] person ... shall be compelled in any criminal case to be a witness against himself." [2] The New Mexico Constitution similarly provides that "[n]o person shall be compelled to testify against himself in a criminal proceeding." N.M. Const. art. II, § 15. The privilege against self-incrimination "reflects many of our fundamental values and most noble aspirations," *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964), and "registers an important advance in the development of our liberty," *Ullman v. United States*, 350 U.S. 422, 426, 76 S.Ct. 497, 500, 100 L.Ed. 511 (1956). The privilege, however, is in tension with the government's power to compel testimony in court or before grand juries or other agencies, which power is "[a]mong the necessary and most important of the powers of the States.... [Compelled] testimony constitutes one of the Government's primary sources of information." *Murphy*, 378 U.S. at 93–94, 84 S.Ct. at 1611 (White, J., concurring). The tension between the privilege against self-incrimination and the governmental power to compel testimony is eased to some extent by immunity statutes. Immunity statutes, properly applied, accord a witness sufficient immunity from prosecution to accommodate the imperatives of the Fifth Amendment, while allowing the government to compel testimony that may be essential to effective prosecution of criminal offenses. *See Kastigar*, 406 U.S. at 445–47, 92 S.Ct. at 1656–58.

2. The Fifth Amendment privilege against self-incrimination is applied to states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493–94, 12 L.Ed.2d 653 (1964) ("The Fourteenth Amendment secures against state invasion the same privilege that the

Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence.").

New Mexico's immunity statute, NMSA 1978, Section 31–6–15 (Repl.Pamp.1984),[3] and its implementing rules, SCRA 1986, 5–116 (Repl.Pamp.1992),[4] and SCRA 1986, 11–412 (Repl.Pamp.1994),[5] are patterned after the federal immunity statute, 18 U.S.C. §§ 6002–6003 (1988). *See* Committee commentary to SCRA 11–412. The federal statute and the New Mexico statute and rules provide for "use" and "derivative use" immunity; that is, the statutes allow the government to compel a witness to testify and then prosecute the witness for the crimes mentioned in the compelled testimony, as long as neither the testimony itself nor any information directly or indirectly derived from the testimony is used in the prosecution.

■ The United States Supreme Court upheld the constitutionality of the federal use and derivative use immunity statute in *Kastigar*, holding that the scope of the immunity provided under the statute is coextensive with the scope of the Fifth Amendment privilege against self-incrimination and is therefore sufficient to allow the state to compel testimony over a claim of the privilege. 406 U.S. at 453, 92 S.Ct. at 1661. Immunity from use and derivative use of compelled testimony guarantees that " 'the witness and the Federal Government [are left] in substantially the same position as if the witness had claimed his privilege' in the absence of a grant of immunity." *Id.* at 458–59, 92 S.Ct. at 1664 (quoting *Murphy,* 378 U.S. at 79, 84 S.Ct. at 1610). Because the immunity is coextensive with the Fifth Amendment privilege, it "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore ensures that the testimony cannot lead to the infliction of criminal penalties on the witness." *Id.* 406 U.S., at 453, 92 S.Ct. at 1661.

This Court adopted the principles of *Kastigar* in *Munoz,* 103 N.M. at 42–45, 702 P.2d at 987–90. In *Munoz,* we observed:

A witness that has been accorded use immunity and that is subsequently prosecuted for offenses revealed during such immunized testimony "is not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities." [*Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1665.] *Kastigar* requires that a defendant only show that he has testified under a grant of immunity. The prosecuting authorities then "have the burden of showing that their evidence is not tainted [by exposure to prior immunized testimony] by establishing that they had an independent, legitimate source for the disputed evidence." *Id.* (quoting [*Murphy,* 378 U.S. at 79 n. 18, 84 S.Ct. at 1609 n. 18]). It is not enough that the prosecuting authorities simply negate the existence of taint in order to meet this burden. Instead, the prosecution has "the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.*

3. Section 31–6–15(A) provides:

If a witness is granted immunity in return for evidence, none of his testimony or any *evidence obtained as a fruit of his testimony* shall be used against him in any criminal prosecution except that such person may be prosecuted for any perjury committed in such testimony or in producing such evidence, or for contempt for failing to give an answer or produce evidence. (Emphasis added.)

4. SCRA 5–116(A) provides:

If a person has been or may be called to testify or produce a record, document, or other object in an official proceeding conducted under the authority of a court or grand jury, the district court for the judicial district in which the official proceeding is or may be held may, upon the written application of the prosecuting attorney, issue a written order requiring the person to testify or produce the record, document or other object notwithstanding his privilege against self-incrimination.

5. SCRA 11–412 provides:

Evidence compelled under an order requiring testimony or the production of a record, document or other object notwithstanding a privilege against self-incrimination, or any information *directly or indirectly derived from such evidence,* may not be used against the person compelled to testify or produce in any criminal case, except a prosecution for perjury committed in the course of the testimony or in a contempt proceeding for failure to comply with the order. (Emphasis added.)

103 N.M. at 42, 702 P.2d at 987 (second alteration in original).

■ When the state prosecutes a witness who has previously testified under an immunity order, the trial court must hold a *Kastigar* hearing. The hearing may be held pretrial, posttrial, during the trial as evidence is offered, or through a combination of these methods, although a pretrial hearing is the most common choice. *United States v. North,* 910 F.2d 843, 854 (D.C.Cir.) (per curiam) (*North I* ), *modified on other grounds,* 920 F.2d 940 (D.C.Cir.1990) (per curiam) (*North II* ), *cert. denied,* 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). At the hearing the state must prove that it will not make evidentiary use of the immunized testimony by demonstrating that the evidence to be used at trial was derived from legitimate independent sources. The state must also prove that it will not make nonevidentiary use of the immunized testimony by demonstrating that it has not used and will not use the testimony to focus additional investigation, interpret evidence, plan cross-examination, or otherwise develop strategy for its conduct of the trial. *See, e.g., United States v. McDaniel,* 482 F.2d 305, 311 (8th Cir. 1973); *United States v. Smith,* 580 F.Supp. 1418, 1424 (D.N.J.1984).

Thus, *Kastigar* imposes two burdens on the government. First, the state must show that it has not made and will not make evidentiary use of the immunized testimony by demonstrating that the evidence presented or to be presented at trial was derived from sources wholly independent of the defendant's immunized testimony. Second, it must show that it has not made and will not make nonevidentiary, or strategic, use of the immunized testimony by demonstrating that those participating in its investigation, trial preparation, and trial presentation have been insulated from exposure to the immunized testimony. It is the state's burden to make this dual showing in order to establish that it has not benefitted in any way from the defendant's immunized testimony. *See Smith,* 580 F.Supp. at 1424.

■ In order to carry its burden, "the government must present evidence, not just argument." *United States v. Mapelli,* 971 F.2d 284, 288 (9th Cir.1992); *see also United States v. Hampton,* 775 F.2d 1479, 1485 (11th Cir.1985) ("[M]ere denials of use by the prosecutors and other government agents are generally insufficient to meet the government's burden, even if made in good faith."). The prosecution must make its proof by a preponderance of the evidence. *E.g., United States v. Schmidgall,* 25 F.3d 1523, 1528 (11th Cir.1994); *North I,* 910 F.2d at 854. Whether the prosecution has met its burden is a question of fact, and the trial court's findings will not be reversed unless clearly erroneous (or, in New Mexico, unless the court has abused its discretion). *See, e.g., United States v. Harris,* 973 F.2d 333, 337 (4th Cir.1992); *United States v. Rivieccio,* 919 F.2d 812, 814 (2d Cir.1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991).

### III.

■ Vallejos contends that, because the State failed to establish the existence of sources of evidence independent of her compelled testimony or to demonstrate that Acosta's exposure to the compelled testimony did not influence his testimony, this Court should reverse her convictions and remand for a new trial. We agree. The State did not carry its burden. Although the trial court ruled, and the State now argues, that the district attorney's office had taken proper precautions to ensure that the prosecuting attorneys and witnesses had not been tainted by exposure to Vallejos's immunized testimony, the record plainly does not support such a finding. Moreover, such a showing by the State is not in itself sufficient to meet the requirements of *Kastigar* and *Munoz.* The State's proof was inadequate in two respects: It failed to show its independent sources of evidence; and it failed to show that its witnesses had not used, directly or indirectly, Vallejos's immunized testimony against her.

The State's proof at the *Kastigar* hearing consisted primarily of District Attorney Rutledge's testimony concerning the steps he

had taken to insulate the prosecution from exposure to Vallejos's compelled testimony. He testified that he had assigned separate prosecutors to Vallejos, Acosta, and Matta's cases and ordered that the prosecutors review the files and decide whether to prosecute their respective defendants. Once they made the decision to prosecute, the prosecutors were told to avoid communication with one another and with the witnesses. All witnesses, police officers, and investigators were instructed not to discuss any immunized testimony they may have heard. Rutledge further testified that each of the prosecutors had been given the case file for the defendant he would be prosecuting and that the prosecutors were instructed not to use any evidence which may subsequently have been generated.

Additional evidence presented at the *Kastigar* hearing included prosecutor Plath's unsworn (and not cross-examined) assertion that all evidence to be presented at Vallejos's upcoming trial had been obtained prior to her immunized testimony at Acosta's preliminary hearing and the investigating police officers' testimony that they had not been exposed to any of the defendants' immunized testimony.

The foregoing evidence was insufficient to prove that the State had legitimate sources of evidence wholly independent of Vallejos's immunized testimony. As already noted, it is not enough for the prosecutor simply to assert that all evidence to be used at trial was obtained prior to the defendant's immunized testimony. In addition, as the Eleventh Circuit Court of Appeals has ruled:

[N]either speculation nor conclusory denials of use or derivative use by government officials will substitute for the affirmative showing of an independent source required for each and every item of evidence presented [at trial]. Each step of the investigative chain by which the evidence presented was obtained must be documented or accounted for. The prosecutor who obtained the indictment may never have seen the immunized testimony and may believe in good faith that no one associated with the federal prosecution has utilized it, but that is not enough.

*Hampton*, 775 F.2d at 1489–90 (citations omitted).

Thus, "[t]he government's 'heavy burden' is not satisfied by the government's mere assertion that the immunized testimony was not used." *United States v. Mauro*, 846 F.Supp. 245, 252 (W.D.N.Y.1994). A trial court holding a *Kastigar* hearing must make "specific findings on the independent nature of the allegedly untainted evidence." *Harris*, 973 F.2d at 337. "Because the burden is upon the government, the appellate court 'may not infer findings favorable to it on these questions.'" *North I*, 910 F.2d at 855 (quoting *United States v. Rinaldi*, 808 F.2d 1579, 1583 (D.C.Cir.1987)).

In the present case, in order to carry its burden the State needed to show the independent sources of its evidence by means such as producing its case file on the Vallejos prosecution and presenting sworn declarations from the prosecutor, investigators, and witnesses affirmatively establishing the independent sources of the evidence upon which the State would rely. *See United States v. Rogers*, 722 F.2d 557, 560 (9th Cir.1983), *cert. denied*, 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984). Because it did not present such evidence, the State failed to carry its burden.

The evidence presented by the State at the *Kastigar* hearing also was inadequate to show that its proposed witnesses were not tainted by exposure to the immunized testimony. The State's efforts to isolate the prosecutor, the investigators, and the witnesses from exposure to that testimony were commendable—but insufficient. As we stated in *Munoz*, in addition to insulating the prosecuting attorney and staff from the immunized testimony, "steps should be taken to ensure that key witnesses will not be exposed to immunized testimony." 103 N.M. at 45, 702 P.2d at 990. The State's proof was lacking because it should have included testimony from the key witnesses, along with testi-

mony from the prosecutor and the investigators, that the witnesses had not had access or otherwise been exposed to Vallejos's immunized testimony. *See Rogers,* 722 F.2d at 560.

In fact, one of the State's key witnesses; Mario Acosta, *had* been exposed to Vallejos's immunized testimony. At the *Kastigar* hearing, Vallejos's counsel told the court that at Acosta's preliminary hearing Acosta had heard Vallejos testify under an immunity order. The court erred by not making a full inquiry into the effect of Acosta's exposure to Vallejos's immunized testimony on his proposed trial testimony and by not ruling that his testimony was tainted by that exposure.

The problem of Mario Acosta's testimony at Vallejos's trial gives rise to the central, specific issue in this case. It is because of Acosta's testimony, specifically, that we reverse the judgment below. Accordingly, we turn now to the difficulties with that testimony.

## IV.

■ In cases in which prosecution witnesses may have been exposed to immunized testimony the hearing must "inquire into the *content* as well as the *sources* of the ... trial witnesses' testimony." *North I,* 910 F.2d at 872. The inquiry into the content and sources of the testimony must proceed witness-by-witness and, if necessary, "line-by-line and item-by-item." *Id.* A prohibited use of immunized testimony "occurs if a witness's recollection is refreshed by exposure to the defendant's immunized testimony, or if his testimony is in any way 'shaped, altered, or affected,' by such exposure." *United States v. Poindexter,* 951 F.2d 369, 373 (D.C.Cir.1991) (citation omitted) (quoting *North I,* 910 F.2d at 863), *cert. denied,* ── U.S. ──, 113 S.Ct. 656, 121 L.Ed.2d 583 (1992); *see also North II,* 920 F.2d at 942 (defendant's Fifth Amendment privilege is "violated whenever the prosecution puts on a witness whose testimony is shaped, directly or indirectly, by compelled testimony").

■ Thus, the burden is on the prosecution "to *prove* that witnesses who testified against the defendant did not draw upon the immunized testimony to use it against the defendant." *North II,* 920 F.2d at 943. The burden might be met by "canning" the trial witness's testimony—that is, by filing and sealing the witness's sworn statement—before his exposure to immunized testimony, and perhaps by other techniques; but when the prosecutor has failed to "can" testimony, "it may well be extremely difficult for the prosecutor to sustain its burden of proof that a witness exposed to immunized testimony has not shaped his or her testimony in light of the exposure." *Id.* at 942–43.

Three weeks before her trial, Nena Vallejos gave compelled testimony under an immunity order at Mario Acosta's preliminary hearing. Before his exposure to Vallejos's immunized testimony, Acosta had given two sworn statements concerning his participation in the circumstances surrounding Elmo Stockard's murder. In the first statement Acosta said that he had gone to Stockard's house with Vallejos and Matta and had waited in the car for fifteen or twenty minutes, after which the two women returned to the car. He also stated that he saw Vallejos carrying some money and items from Stockard's house to the car when she returned. In his second statement, made under an immunity order at Vallejos's preliminary hearing, he testified that he had gone to Stockard's house with the two women but that he was passed out drunk in the back of the car and saw nothing. At Vallejos's trial, however, Acosta changed his story a second time and testified to a *third* version: that he had gone inside the house with the women and had witnessed Vallejos stab Stockard to death.

The trial court should have made inquiry at the *Kastigar* hearing into the extent of Acosta's exposure to Vallejos's immunized testimony and how that exposure might influence his testimony. *See North I,* 910 F.2d at 863. In order to prove that Acosta's testimony was not tainted by this exposure, the State had to show that the exposure in no way "shaped, altered, or affected" his testimony or otherwise refreshed his recollection.

See *Poindexter*, 951 F.2d at 373. Admittedly, the State was, and is, under a virtually insurmountable burden in this case, even apart from the inconsistencies between Acosta's testimony at trial and his previous statements. The State at no time has asserted that before his exposure to Vallejos's immunized testimony Acosta had made a statement, sworn or otherwise, concerning the murder that was consistent in all respects with his testimony at the trial. Thus, it cannot make a showing "that the allegedly tainted testimony contains no evidence not 'canned' by the prosecution before such exposure occurred." *North I*, 910 F.2d at 872–73.

The State did have sworn statements from Acosta before his exposure to the immunized testimony. Those statements, however, were altogether inconsistent with his testimony at trial. The fact that Acosta developed an entirely new story after hearing Vallejos's immunized testimony is devastating to the prosecution. As the District of Columbia Court of Appeals explained in *North I*, "the use of immunized testimony by witnesses to refresh their memories, or to otherwise focus their thoughts, organize their testimony, *or alter their prior or contemporaneous statements*, constitutes indirect evidentiary ... use." 910 F.2d at 860 (emphasis added); *see also North II*, 920 F.2d at 954–55 (Wald, C.J., dissenting) (specific evidence that testimony is tainted includes contradictions between testimony made before and testimony made after exposure). Acosta altered his earlier statements after exposure to Vallejos's immunized testimony; by inculpating her, he sought—at least arguably—to exculpate himself. The prosecution therefore made indirect evidentiary use of her testimony in violation of the principles of *Kastigar* and *Munoz*. *See* SCRA 11–412 ("information directly or indirectly derived from [compelled testimony] may not be used against the person compelled to testify ... in any criminal case"); *Hampton*, 775 F.2d at 1486 (prosecutorial authorities must "affirmatively establish that none of the evidence [to be presented at trial] was derived directly or indirectly from the immunized testimony").

We hold that the State failed to carry its burden to show independent sources for its evidence and, specifically, its burden to show that Acosta's exposure to Vallejos's immunized testimony did not influence his trial testimony. We therefore conclude that her testimony was used against her.

We realize that the State has a difficult task to perform in attempting to prove that no use has been made of a witness's immunized testimony in the witness's subsequent prosecution for crimes discussed in that testimony. But, as we noted at the outset of this opinion, the State must be aware that when it grants immunity it runs the "grave risk" that any future prosecution of an immunized witness for past crimes may, as a practical matter, be impossible. It must show that legitimate independent sources of its evidence exist and that the prosecutor, investigators, and witnesses have not been exposed to the immunized testimony. If a trial witness has been exposed to such testimony, the State must show that the exposure in no way influenced the witness's testimony. Inability to meet this burden will lead to the disappointing result of a failed prosecution. However, as the District of Columbia Court of Appeals has noted,

> We readily understand how court and counsel might sigh prior to such an undertaking. Such a *Kastigar* proceeding could consume substantial amounts of time, personnel, and money, only to lead to the conclusion that a defendant—perhaps a guilty defendant—cannot be prosecuted. Yet the very purpose of the Fifth Amendment under these circumstances is to prevent the prosecutor from transmogrifying into the inquisitor, complete with that officer's most pernicious tool—the power of the state to force a person to incriminate himself. As between the clear constitutional command and the convenience of the government, our duty is to enforce the former and discount the latter.

*North I*, 910 F.2d at 861. In short, the individual's Fifth Amendment privilege against self-incrimination must be protected from the state's abuse of its power to compel testimony.

We reverse Vallejos's convictions and remand the case to the district court for retrial or for further proceedings consistent with this opinion.

IT IS SO ORDERED.

RANSOM and FROST, JJ., concur.