1998-NMCA-024

954 P.2d 1193

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Genaro OLIVAS, Defendant–Appellant.**

No. 18044.

Court of Appeals of New Mexico.

Jan. 13, 1998.

Tom Udall, Attorney General, M. Anne Kelly, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee.

Paul J. Kennedy, Albuquerque, for Defendant–Appellant.

## OPINION

PICKARD, Judge.

1. This case involves the extension of use immunity to statements made during the course of court-ordered treatment and a psychological evaluation. Following a jury trial, Defendant was convicted of intentional child abuse resulting in death. On appeal, Defendant raises two issues: (1) whether a *Kastigar* hearing was required to determine if the State and its witnesses had been exposed to immunized statements made by Defendant during court-ordered psychological treatment and (2) whether the State improperly used the prior inconsistent statements of Ramona Saenz as substantive evidence. We affirm.

### FACTS

2. Following a jury trial, Defendant was convicted of intentional child abuse resulting in death for the beating death of his two-and-a-half-year-old son, Victor. The fatal injury was alleged to have occurred on March 13, 1995. A year prior to trial, on June 12, 1995, Defendant had been granted use immunity from criminal prosecution for statements made during court-ordered psychological examinations and treatment arranged by the Children, Youth and Families Department (CYFD).

3. On the day of trial, Defendant's counsel argued to the court that the district attorney's office had been exposed to immunized statements made by Defendant during court-ordered treatment. Counsel explained that the prosecuting attorney had been in contact with a social worker involved in Defendant's treatment. Additionally, the prosecuting attorney had reviewed several reports which Defendant contended tracked his progress, his impressions, and his statements made throughout the course of court-ordered treatment. Defendant asked the court to conduct a hearing to impose upon the State its burden under *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), to prove that the State would not make non-evidentiary or strategic use of Defendant's immunized statements.

4. In response, the State argued that the social worker had not been exposed to Defendant's immunized statements, but rather had been tracking Defendant's attendance at the court-ordered treatment. The State also explained that the social worker did not provide any treatment to Defendant. Additionally, the reports reviewed by the prosecuting attorney did not contain any references to Defendant's treatment. Finally, the State contended that the immunity order entered pursuant to NMSA 1978, Section 32A–4–11(C) (1993) did not cover statements made to other CYFD workers.

5. The court then took a recess to determine if the reports reviewed by the district attorney's office were covered by the immunity order. The court denied Defendant's motion ruling that the reports "are not the type that were envisioned as being protected by the immunity order of the Court." The court also indicated that it would revisit the motion throughout the trial if any of the material contained in the reports was being used to the State's advantage.

### DISCUSSION

#### I. Immunity

##### A. Generally

■ 6. Defendant claims the trial court erred by failing to order a *Kastigar* hearing to determine if the State's evidence was derived from Defendant's immunized statements. *Kastigar* is the leading case addressing the prohibition on prosecutors from using a witness's immunized testimony in any respect against him or her in a subsequent criminal prosecution. Once defendants have shown that they have testified under a grant of immunity, the prosecuting attorneys then " 'have the burden of showing that their evi-

dence is not tainted [by exposure to prior immunized testimony] by establishing that they had an independent, legitimate source for the disputed evidence.' " *State v. Munoz*, 103 N.M. 40, 42, 702 P.2d 985, 987 (1985) (quoting *Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1665).

■ 7. However, the *Kastigar* standard requires Defendant to make an initial showing that he made statements under a grant of immunity. *See Kastigar*, 406 U.S. at 461–62, 92 S.Ct. at 1665 ("One raising a claim under [the immunity] statute need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources."). Defendant claims the reports reviewed by the district attorney contained his immunized statements. We disagree.

■ 8. Immunity attached to Defendant's statements given after the entry of the order on June 12, 1995. Several reports, one of which contains Defendant's admissions of his problems with alcohol, his use of marijuana, and an arrest for driving while intoxicated, were completed prior to the grant of immunity. One of these reports also alludes to statements by Defendant that he and his sons' mother, Ramona, were experiencing problems in their relationship and that Defendant did not have a strong connection to his son prior to his death. However, these statements were not protected by the grant of immunity as they were given prior to the entry of the order.

■ 9. As for the reports covering the time after the immunity order, they do not contain any substantive statements made by Defendant. The reports do contain general observations of Defendant's parenting skills with his son Francisco. Also included are a general treatment plan and statements advising that Defendant continue counseling for grief over Victor's death and continue the parenting-skills sessions. Not one of the reports contains any statement by Defendant relating to the incident and circumstances of Victor's death. Moreover, the reports do not contain any reference to the psychological exam to which Defendant submitted. In fact, the psychological exam was not administered until after the social worker had transferred the case to another agency, and no statements by Defendant from that exam are contained in any of the reports.

10. Furthermore, the record suggests no knowledge by the prosecuting attorney of the substance of Defendant's immunized statements. In fact, no use was made of any information that the prosecution may have gained from reviewing Defendant's attendance reports. Insofar as Defendant's contention that the prosecutor could have made strategic use of the statements in focusing the investigation, planning trial strategy, and refusing to plea bargain is concerned, the record reveals that the prosecutor first saw the reports on the Friday before the trial was to begin on Monday. General observations of Defendant's parenting skills with Francisco were not used at trial, and we fail to see how they could have been used to convict Defendant of Victor's death. Under the facts herein, nothing in the reports tainted the evidence relied upon by the State. Thus, we conclude that despite the district attorney's review of the reports, Defendant and the State were left " 'in substantially the same position as if the witness had claimed his privilege' in the absence of a grant of immunity." *Kastigar*, 406 U.S. at 458–59, 92 S.Ct. at 1664 (quoting *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79, 84 S.Ct. 1594, 1610, 12 L.Ed.2d 678 (1964)).

11. Additionally, the trial judge assured Defendant that he would revisit his ruling if it became apparent that the State was using any information contained in the reports. This special precaution was in place to avoid any possible taint arising from the State reviewing Defendant's reports. But Defendant never asked the trial judge to revisit his ruling. We do not hold that Defendant thereby waived the issue. *But cf. State v. Shafer*, 102 N.M. 629, 635, 698 P.2d 902, 908 (Ct.App.1985) (where court restricted the defendant's cross examination and defendant said he would take up matter later, but never did, any error was waived). However, the facts that Defendant never asked the court to revisit the matter and the court never revisited the matter on its own strongly suggest the absence of any exposure to immunized

statements. *See Munoz,* 103 N.M. at 44, 702 P.2d at 989 (discussing *United States v. Pantone,* 634 F.2d 716 (3rd Cir.1980), for the proposition that there is no *Kastigar* violation when the immunized testimony reveals nothing new or beneficial); *see also United States v. North,* 910 F.2d 843, 860 (D.C.Cir. 1990) (holding that without "significant exposure" to the immunized testimony, the prosecutor could not have made significant non-evidentiary use).

12. The New Mexico cases Defendant cites for support are distinguishable. In *Munoz,* the defendant was compelled to testify at his co-defendant's trial under a grant of use immunity. The defendant's immunized testimony revealed, for the first time, his defense of coercion. *Munoz,* 103 N.M. at 41, 702 P.2d at 986. At the defendant's subsequent trial, the same district attorney that prosecuted the co-defendant prosecuted the defendant. *Id.* Furthermore, the district attorney presented a motion in limine seeking to impeach the defendant's claim of coercion—a subject revealed only during the defendant's immunized testimony. *Id.* The district attorney also reviewed a transcript of the defendant's immunized testimony in preparation for trial. *Id.* at 41–42, 702 P.2d at 986–87. The Court held that the district attorney was not insulated from the defendant's immunized testimony and that the "State and the defendant were not in 'substantially the same position' as if defendant had retained the right to remain silent." *Id.* at 44, 702 P.2d at 989 (quoting *Murphy,* 378 U.S. at 79, 84 S.Ct. at 1610).

13. Defendant's reliance on *State v. Vallejos,* 118 N.M. 572, 883 P.2d 1269 (1994), is similarly misplaced. In *Vallejos,* the prosecution witness heard the defendant's immunized testimony and subsequently changed his testimony to exculpate himself and inculpate the defendant. *Id.* at 580, 883 P.2d at 1277. In this case, we conclude the district attorney did not review or have any exposure to Defendant's immunized statements and the trial court did not err in failing to hold a *Kastigar* hearing on this matter.

14. Finally, although we have not found any violation of the Fifth Amendment, we must caution the district attorney, as did the Court in *Munoz,* 103 N.M. at 44–45, 702 P.2d at 989–90, that prosecution of this case was potentially jeopardized by viewing material that could well have contained reference to Defendant's immunized statements. In view of the heavy burden to show lack of taint once exposure to immunized statements occurs, it would appear most prudent in the future to avoid the possibility of taint by not taking the chance.

**B. Ramona's Testimony**

15. Defendant claims that Ramona was present during many of the counseling sessions he attended at Peanut Butter and Jelly Therapeutic Center. Defendant claims that the court erred in not ordering a *Kastigar* hearing to determine whether Ramona's testimony was tainted by exposure to Defendant's immunized statements. This was necessary, Defendant explains, because Ramona was present during the counseling sessions and was exposed to all immunized statements made by Defendant during those sessions. We disagree.

16. The presentation of a trial witness's testimony that has been derived from or influenced by the defendant's immunized testimony is forbidden. *North,* 910 F.2d at 865. However, Defendant failed to preserve the issue of Ramona's exposure to his immunized statements for appeal. Before trial, Defendant argued to the court that a *Kastigar* hearing was necessary because the prosecuting attorney had reviewed reports tracking Defendant's attendance at court-ordered treatment. Defendant did not raise the separate issue that a *Kastigar* hearing should be ordered based upon Ramona's exposure to Defendant's immunized statements.

17. Nevertheless, Defendant argues that the proffer of his reports to the court was sufficient to alert the trial judge to the possibility of a Fifth Amendment violation through Ramona's exposure to his immunized statements. However, Defendant's proffer, and the argument accompanying that proffer, were specifically addressed to whether the prosecuting attorney had violated the immunity order by reviewing Defendant's reports. No mention was made of any possible taint that might result by Ramona's exposure to Defendant's statements during the counseling sessions.

[6] 18. Furthermore, during trial, as the prosecuting attorney questioned Ramona about the events surrounding her son's death, Defendant never protested that Ramona's testimony might be influenced by her exposure to his immunized statements. Defendant never alerted the trial court to the possibility that Ramona's testimony might violate the immunity order. *See State v. Lopez,* 105 N.M. 538, 544, 734 P.2d 778, 784 (Ct.App.1986) ("To preserve a claim of error for appellate review involving the admissibility of evidence, a party must make a timely objection."); *State v. Lucero,* 104 N.M. 587, 590, 725 P.2d 266, 269 (Ct.App.1986) (to preserve an issue for appeal, defendant must specifically apprise the trial court of the nature of the claimed error). Therefore, because Defendant failed to offer specific argument concerning a possible violation of the immunity order on these grounds, and because he neglected to object to Ramona's testimony on these grounds, we conclude that Defendant failed to preserve this issue for appeal.

19. Nonetheless, our review of the record fails to support Defendant's claim that Ramona's testimony violated his Fifth Amendment rights. In *Vallejos,* our Supreme Court recognized that "canning" a witness's testimony prior to exposure to a defendant's immunized statements might be sufficient to meet the prosecution's burden of showing an independent legitimate source for the witness's testimony. *Vallejos,* 118 N.M. at 579, 883 P.2d at 1276; *see also Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1665 (prosecution must show that it has a legitimate source of evidence wholly independent of any compelled testimony).

■ 20. In this case, the prosecuting attorney had an independent legitimate source for Ramona's testimony—her prior statements to the police. These statements, which were inconsistent with Ramona's testimony at trial, were used to impeach her story that Defendant did not harm his son. These "canned" statements outlined the many stories Ramona gave to the police: that Victor's death was caused by a fall in the living room, that Victor fell from his booster chair in the kitchen, that Victor fell while playing with Defendant, that Defendant punished his son for spilling or throwing milk, that Defendant hit his son on the back of the

head, and that Defendant kicked his son causing him to fall on the floor.

21. Moreover, the portion of Ramona's testimony which was not based upon her prior statements to the police tended to exculpate Defendant. We conclude that Ramona's statements to the police made prior to her participation in Defendant's court-ordered treatment, along with the exculpatory nature of her testimony, were sufficient to show her testimony was not influenced by Defendant's immunized statements.

## II. Prior Inconsistent Statements

22. Defendant argues that the State improperly used the prior inconsistent statements of Ramona to impeach her testimony. Defendant also contends that the State impermissibly used Ramona's prior inconsistent statements as substantive evidence in closing argument.

### A. Standard of Review

■ 23. The decision to allow admission of a witness's prior inconsistent statements rests in the sound discretion of the trial court. *State v. Gonzales,* 113 N.M. 221, 228, 824 P.2d 1023, 1030 (1992); *State v. Davis,* 97 N.M. 130, 133, 637 P.2d 561, 564 (1981). The decision of the trial court to admit prior inconsistent statements will not be reversed absent an abuse of discretion. *Davis,* 97 N.M. at 133, 637 P.2d at 564.

### B. Ramona's Testimony

■ 24. At the trial, Ramona's testimony was that Defendant did not hit Victor the day he died, but rather the child had fallen. This testimony differed from various statements that Ramona made to others that Defendant hit his son as punishment for spilling milk, that Defendant punched and hit his son on the back of the head, and that Defendant "killed my jito."

25. The State questioned Ramona about these previous statements which conflicted with her testimony on the stand. Because these prior inconsistent statements were not made under oath and subject to the penalty of perjury, they were not introduced as substantive evidence. *See* Rule 11–801(D)(1)(a),

NMRA 1997. The statements were, however, properly used as impeachment evidence to challenge Ramona's credibility and the credibility of her testimony at trial which exculpated Defendant. *See* Rule 11–613, NMRA 1997; *see also Weiland v. Vigil*, 90 N.M. 148, 154, 560 P.2d 939, 945 (Ct.App. 1977) (holding that impeachment of a witness through a prior inconsistent statement "allows a jury to judge the weight to be given to the testimony of the witness").

26. Defendant argues that the statements should not have been used because of their "patently unreliable nature." Defendant explains that the statements were made in the middle of the night when Ramona was threatened by the investigating detective with the possibility of arrest and of not attending her child's funeral if she did not change her story. To the extent that these statements may have been unreliable in light of the circumstances in which they were made, this was a matter for trial counsel to explore on cross examination of the witness. In this case, Defendant's counsel questioned Ramona regarding the circumstances in which she made these statements. Defense counsel also argued the unfairness of the detective's interrogation methods during his closing argument. We conclude that these challenges to the circumstances under which Ramona's statements were made were sufficient to point out their possible unreliability, and we hold that the circumstances on which Defendant relies go to the weight, and not necessarily the admissibility, of the statements. *See Pece v. Cox*, 74 N.M. 591, 592, 396 P.2d 422, 423 (1964) (where voluntariness of statements is properly raised, court initially determines voluntariness and then submits statements to jury for it to consider voluntariness, as well as weight to give statements).

### C. Closing Argument

27. Defendant next argues that the State improperly used Ramona's prior inconsistent statements as substantive evidence during closing argument. However, Defendant did not timely object and failed to preserve this issue for appeal. *See State v. Baca*, 120 N.M. 383, 392, 902 P.2d 65, 74 (1995) (defendant's failure to object to prosecutor's improper remark cannot be used as a basis to overturn defendant's conviction); *State v. Gonzales*, 112 N.M. 544, 550, 817 P.2d 1186, 1192 (1991) ("Unless a prosecutor's remark constitutes fundamental error, review by an appellate court must be predicated upon a timely objection by a defendant.").

28. Furthermore, we conclude that the State's arguments do not rise to the level of fundamental error. *See State v. Escamilla*, 107 N.M. 510, 516, 760 P.2d 1276, 1282 (1988) (doctrine of fundamental error applied to excuse failure to make proper objection below only if innocence of defendant appears indisputable or if question of guilt is so doubtful that it would shock the conscience of the court to permit the conviction to stand). Though the evidence was conflicting, there was substantial evidence that Defendant intentionally struck the blow to the child from which he died.

### CONCLUSION

29. We affirm.

30. **IT IS SO ORDERED.**

DONNELLY and ALARID, JJ., concur.