This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-38449**

**STATE OF NEW MEXICO,**

　　　　Plaintiff-Appellee,

v.

**MITCHELL OVERHAND,**

　　　　Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Daniel E. Ramczyk, District Judge**

Hector H. Balderas, Attorney General
Cole P. Wilson, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Santa Fe, NM
Luz C. Valverde, Assistant Appellate Defender
Albuquerque, NM

for Appellant

## MEMORANDUM OPINION

**MEDINA, Judge.**

**{1}** Mitchell Overhand (Defendant) appeals his convictions for one count of false imprisonment, contrary to NMSA 1978, Section 30-4-3 (1963); and one count of conspiracy to tamper with evidence, contrary to NMSA 1978, Sections 30-22-5(A) (2003) and 30-28-2(A) (1979). On appeal, Defendant argues the evidence is insufficient to support his convictions on both counts. We affirm.

**BACKGROUND**

**{2}** The following facts are derived from the trial testimony in this case. In August 2017, Matthew Tressler, the victim in this case, went to Chase Smotherman's house to sell him marijuana. Tressler knew Smotherman through one of his best friends, John Soyka. Tressler visited Smotherman's house on two prior occasions to buy or sell marijuana, and met Smotherman's girlfriend, Mariah Ferry, during one of those visits. He had not previously met Defendant.

**{3}** Prior to Tressler's arrival, Smotherman instructed him to park his vehicle at a city park down the street from the home, which Smotherman had not previously asked Tressler to do. As Tressler walked up to the front door, Smotherman stood in the doorway and asked him to come inside. When Tressler entered the home, he immediately "got hit" by an unknown assailant and fell to the floor. Smotherman, Ferry, and others began beating Tressler and yelling at him. Tressler observed that Defendant was present during this assault, though he did not think Defendant participated in the assault. While Tressler was dazed from the beating, Smotherman rolled him over onto his back so that Ferry could gag him and bind his wrists and ankles with duct tape.

**{4}** During the attack, the assailants repeatedly asked Tressler where the "weed" was located. Initially Tressler believed they were referring to the marijuana he brought to sell Smotherman, but quickly realized the assailants were referring to different marijuana. Someone had stolen marijuana from Smotherman, and it appeared Smotherman believed Tressler had committed the theft along with Soyka. The group moved Tressler to the dining room where Smotherman and Ferry stood on either side of a computer, displaying an image of Soyka, who had been killed and his genitals had been severed and stuffed into his mouth.

**{5}** After Tressler viewed the image of Soyka, the assailants continued to beat him with a baseball bat and a stick. Everyone present screamed at Tressler, including Defendant, demanding to know where the stolen money and drugs were located. As questioning continued, Defendant struck Tressler in the head and asked if Tressler knew who he was, if Tressler had been to prison, and who Tressler had been to prison with. After Tressler responded, he overheard Defendant and Smotherman talking about him in the kitchen and Defendant arguing for letting Tressler go free. Tressler testified that Defendant "knew immediately [Tressler] didn't know what . . . they were talking about" when it came to Tressler's involvement in the theft. Upon realizing Tressler was not involved in the theft, Smotherman and Ferry were unsure what to do and looked to Defendant for advice regarding the disposition of Tressler.

**{6}** Defendant and Smotherman discussed the situation for several hours. Meanwhile, Tressler remained with Ferry who continued to physically and psychologically torture him, including cutting him with the weapon she told him she used on Soyka, pouring rubbing alcohol in his wounds, and opening the door and pretending to release Tressler then yelling that he was attempting to escape. When Ferry pretended to release Tressler, he began attempting to loosen the duct tape around his wrists, which the group immediately discovered and then zip-tied his wrists as an additional restraint. At another point, Smotherman threatened Tressler's family

members, forcing him to call his ex-wife and get his daughters' addresses. Tressler took these threats seriously and believed he was going to die. Defendant's girlfriend arrived approximately five hours after the incident began, at which point Defendant told Tressler he would be leaving soon. Tressler did not believe that he would be set free, still terrified that he would be killed.

{7}     Prior to leaving, Tressler observed Smotherman directing Ferry to clean his blood from the residence. Previously, Tressler had stated to police that he observed Defendant directing Ferry to clean blood from the walls and other areas of the home while Smotherman directed the rest of the cleanup. Although Ferry did most of the cleaning, Defendant assisted her. When asked directly whether Defendant was also cleaning, Tressler responded, "Yeah I guess."

{8}     Defendant, his girlfriend, and Tressler left the home shortly after she arrived. At this point, Tressler's legs had been freed so he could walk to his truck—which had been moved to the front of the house at some point in the evening—but his hands were still zip-tied. Defendant helped Tressler get into the passenger seat, then Defendant drove the truck to his girlfriend's house where they provided Tressler with pizza and beer. Defendant told Tressler he would be okay, but Tressler still believed he would be killed.

{9}     Tressler briefly accompanied Defendant and his girlfriend to the second level of the residence, but spent the remainder of the night alone on the first level. Though the atmosphere at the girlfriend's residence was the "polar opposite" of that in Smotherman's home, Tressler remained afraid, doing anything that Defendant and his girlfriend asked. At one point, Defendant told Tressler "there's the door," possibly implying that Tressler could leave, but Tressler was afraid and could barely walk due to his injuries. Tressler did eventually attempt to leave, but stopped after Defendant came downstairs and asked what Tressler was doing. In response, Tressler said that he was going to the bathroom, so Defendant led him to the bathroom and stood in the doorway until Tressler finished.

{10}     Defendant and Tressler left the girlfriend's residence sometime between 5:30 and 6:00 a.m. Although Tressler believed he was being taken somewhere to be killed, Defendant instead drove him to Defendant's home, where he gave Tressler the keys to his truck and wiped down the steering wheel. Before leaving, Defendant told Tressler that he had "been spared," and asked Tressler to contact him once Tressler contacted the police. Tressler delayed contacting the police for three days due to ongoing fear of the threats made against him and his family. Prior to reporting the incident to the police, Tressler kept in contact with Defendant. While Tressler believed Defendant had saved his life, he also remained afraid due to the attack that had occurred at Smotherman's home.

## DISCUSSION

{11}     Defendant challenges the sufficiency of the evidence supporting his convictions. "The test for sufficiency of the evidence is whether substantial evidence of either a

direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks and citation omitted). We "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. We disregard all evidence and inferences that support a different result. *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. "We then determine whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Garcia*, 2016-NMSC-034, ¶ 15, 384 P.3d 1076 (internal quotation marks and citation omitted). "Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883.

**False Imprisonment**

**{12}**    Before addressing the elements instructions for false imprisonment, we note that the jury was additionally instructed on accessory liability and that Defendant could be "found guilty of a crime even though [D]efendant did not do the acts constituting the crime" so long as the jury found that (1) "[D]efendant intended that another person commit the crime; [(2)] Another person committed the crime; and [(3) D]efendant helped, encouraged, or caused the crime to be committed." Our review, then, focuses on the sufficiency of the evidence supporting Defendant's false imprisonment conviction as a principal or accessory.

**{13}**    The jury was instructed in relevant part that, to convict Defendant of false imprisonment, the State had to prove beyond a reasonable doubt that Defendant intentionally confined or restrained Tressler without his consent and that Defendant knew he had no lawful authority to restrain Tressler. This instruction is consistent with the false imprisonment statute, which defines false imprisonment as "intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so." Section 30-4-3.

**{14}**    Defendant challenges the first element requiring a showing that he intentionally confined or restrained Tressler, arguing that the State failed to prove either principal or accessory liability for false imprisonment. Defendant argues that the State failed to establish Defendant's specific intent to restrain Tressler or that he assisted the other assailants in restraining Tressler for the purpose of his accessory liability.

**{15}**    False imprisonment can be based on words, acts, or gestures and does not require physical restraint of the victim. *State v. Muise*, 1985-NMCA-090, ¶ 22, 103 N.M. 382, 707 P.2d 1192. An accessory must share the criminal intent of the principal. *State v. Carrasco*, 1997-NMSC-047, ¶ 7, 124 N.M. 64, 946 P.2d 1075. This intent may be shown by "acts, conduct, words, signs, or by any means sufficient to incite, encourage or instigate commission of the offense or calculated to make known that commission of

an offense already undertaken has the aider's support or approval." *State v. Ochoa*, 1937-NMSC-051, ¶ 31, 41 N.M. 589, 72 P.2d 609.

**{16}** Viewing the evidence in the light most favorable to the guilty verdict, we conclude that sufficient evidence was offered to prove both: that Defendant's conduct supported Smotherman and Ferry's restraint of Tressler and Defendant restrained Tressler himself. Defendant was present upon Tressler's arrival at Smotherman's home and, following that arrival, Tressler was struck by an unknown assailant and bound with duct tape. In the dining room, Defendant, Smotherman, and Ferry continued to yell at and question Tressler, at which time Defendant struck him in the head. When Smotherman and Ferry realized that Tressler was not the individual who had stolen marijuana from Smotherman, they looked to Defendant for advice. Defendant and Smotherman discussed what to do with Tressler for nearly five hours while Ferry continued to torture him. Tressler specifically testified that Defendant "play[ed] a part" in the restraint and torture that occurred at Smotherman's home.

**{17}** When Defendant told Tressler that he would be leaving soon, Tressler did not believe Defendant would set him free, and Defendant kept Tressler's hands bound during the drive to his girlfriend's residence, only freeing his feet so he could walk. Tressler was afraid to leave the girlfriend's residence and, when he did attempt to leave, Defendant came downstairs nearly immediately, asked Tressler what he was doing, and when Tressler said he was going to the bathroom, Defendant escorted him there and watched Tressler until he finished. Tressler believed he was going to be killed until he was driven to Defendant's home and finally released. These numerous facts support the inference that Defendant encouraged Smotherman and Ferry's restraint of Tressler and that Defendant restrained Tressler. *See, e.g.*, *State v. Herrera*, 2015-NMCA-116, ¶¶ 13-14, 19, 362 P.3d 167 (holding that testimony that the victims were yelled at, threatened with a knife, and strip-searched was sufficient to support restraint element of kidnapping conviction).

**{18}** To the extent Defendant argues that the State did not present any evidence that he demonstrated an intent to restrain Tressler, we disagree. Intent is subjective and can be inferred from other facts in the case. *See State v. Vigil*, 1990-NMSC-066, ¶ 2, 110 N.M. 254, 794 P.2d 728 ("Intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." (internal quotation marks and citation omitted)); *State v. Stefani*, 2006-NMCA-073, ¶ 39, 139 N.M. 719, 137 P.3d 659 ("[T]he jury [is] free to draw inferences [from] the facts necessary to support a conviction[.]"). Based on the testimony of Tressler, a reasonable jury could infer that Defendant either intended to restrain Tressler himself or shared in Smotherman and Ferry's intent to restrain Tressler. Viewing the evidence in the light most favorable to the jury verdict, we find that sufficient evidence was offered to support Defendant's conviction for false imprisonment.

**Conspiracy to Tamper With Evidence**

**{19}** The jury was instructed in relevant part that to convict Defendant of conspiracy to tamper with evidence, the State had to prove beyond a reasonable doubt that Defendant and another person by words or acts agreed together to commit tampering with evidence and that Defendant and the other person intended to commit tampering with evidence. This instruction is consistent with both the tampering with evidence statute and the conspiracy statute. "Tampering with evidence consists of destroying, changing, hiding, placing, or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another." Section 30-22-5(A). "Conspiracy consists of knowingly combining with another for the purpose of committing a felony." Section 30-28-2(A). Conspiracy is a specific intent crime. *State v. Baca*, 1997-NMSC-059, ¶ 51, 124 N.M. 333, 950 P.2d 776. To be convicted of conspiracy, the defendant must have both the intent to agree and the intent to commit the offense that is the object of the conspiracy. *Id.*; *State v. Varela*, 1999-NMSC-045, ¶ 42, 128 N.M. 454, 993 P.2d 1280.

**{20}** Defendant argues that his testimony regarding the cleanup of the house forms the sole basis for his conviction and that it cannot suffice because it was a statement introduced for impeachment purposes. Defendant also argues that the State did not present any evidence of communication between himself, Smotherman, and Ferry to agree to clean up the scene from which the jury could determine—even based on circumstantial evidence—that an agreement was reached. We conclude that sufficient evidence supports Defendant's conspiracy to tamper with evidence conviction.

**{21}** At trial, Tressler testified that Smotherman directed the cleanup prior to his release, at which point the State introduced Tressler's prior statement to police that Defendant directed Ferry to clean blood from areas of Smotherman's house. Following impeachment, the State asked Tressler directly whether Defendant "specifically direct[ed] . . . Ferry to clean up some blood on the wall" to which he responded, "Yeah, I believe he told her to 'grab that too' " and whether Defendant took part in the cleanup, to which he responded, "Yeah I guess." The State elicited relevant, substantive testimony from Tressler in line with his previous statements. Upon Tressler's contradictory response, the State could impeach his testimony with Tressler's original statement to the police that Defendant directed the cleanup. *See Varela*, 1999-NMSC-045, ¶ 29 ("[I]f the prosecution elicits relevant, substantive testimony from the witness, it may impeach its witness with prior inconsistent statements about the same matter being testified to at trial." (internal quotation marks and citation omitted)). Impeachment of a witness through a prior inconsistent statement gives the jury an opportunity to determine the weight that should be given to the testimony of a witness. *State v. Olivas*, 1998-NMCA-024, ¶ 25, 124 N.M. 716, 954 P.2d 1193. Based on Tressler's testimony and his prior inconsistent statement, a reasonable jury could infer that Tressler's recounting of the cleanup was not entirely accurate and that Defendant did work with Smotherman and Ferry to clean up the blood. *See Tapia v. Panhandle Steel Erectors Co.*, 1967-NMSC-108, ¶ 7, 78 N.M. 86, 428 P.2d 625 ("[O]nly the trier of facts may weigh the testimony, determine the credibility of witnesses, reconcile inconsistent or contradictory statements of a witness, and say where the truth lies.").

**{22}** To the extent Defendant also argues that the State did not present evidence of an agreement between himself, Smotherman, and Ferry to clean up the scene, we point out that conspiracy can be demonstrated through actions, not just words. *See Herrera*, 2015-NMCA-116, ¶ 18. A reasonable jury could infer that Defendant took action in furtherance of a conspiracy, either by directing or taking part in the cleanup, since Tressler's prior inconsistent statement called into question the truth of his statement about Smotherman's direction.

**{23}** Additionally, when considering all of Tressler's testimony, not just his statements about the cleanup, the jury could have reasonably inferred the existence of a conspiracy from the circumstances as a whole. Defendant was present when Tressler arrived at Smotherman's home, took part in questioning Tressler alongside Smotherman and Ferry, and spent several hours discussing how to handle Tressler with Smotherman. The jury could have inferred that Defendant, Smotherman, and Ferry were part of a common criminal enterprise that included destruction of the evidence of the attack on Tressler. *See, e.g.*, *Herrera*, 2015-NMCA-116, ¶¶ 15, 19 (finding a common enterprise where one defendant fetched a second defendant from another room, the defendants forcibly shut the door when one victim tried to leave, and concluding the defendants' strip-search of victims to be sufficient evidence to support conspiracy to commit kidnapping despite no overt discussion of the defendants' plans); *State v. Padilla*, 1994-NMCA-067, ¶ 8, 118 N.M. 189, 879 P.2d 1208 (holding that the jury could reasonably infer a conspiracy to commit armed robbery from the defendant's tires squealing as she drove robber away from gas station, failure to stop for police vehicle, and attempt to change appearance).

**{24}** Viewing the evidence in the light most favorable to the jury verdict, we conclude that sufficient evidence was offered to support Defendant's conviction for conspiracy to tamper with evidence.

**CONCLUSION**

**{25}** For the forgoing reasons, we affirm Defendant's convictions for false imprisonment and conspiracy to tamper with evidence.

**{26}  IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**KRISTINA BOGARDUS, Judge**