1999-NMSC-045

993 P.2d 1280

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Mauricio "Archie" VARELA,
Defendant–Appellant.**

No. 24,669.

Supreme Court of New Mexico.

Dec. 13, 1999.

Phyllis H. Subin, Chief Public Defender, Laurel A. Knowles, Assistant Appellate Defender, Santa Fe, for Appellant.

Hon. Patricia A. Madrid, Attorney General, Joel Jacobsen, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

MINZNER, Chief Justice.

{1} Defendant appeals from a judgment and sentence entered following a jury trial at which he was convicted of felony murder, contrary to NMSA 1978, § 30–2–1(A)(2) (1963) and NMSA 1978, § 30–1–13 (1963), shooting at a dwelling, contrary to NMSA 1978, § 30–3–8 (1993) and NMSA 1978, § 30–1–3 (1963), and conspiracy, contrary to NMSA 1978, § 30–28–2 (1963). On appeal, Defendant claims that (1) the Legislature did not intend to punish causing death by shooting at a dwelling under Section 30–3–8; the trial court erred (2) in admitting the State's gang expert testimony and (3) in admitting impermissible impeachment and hearsay evidence; (4) his convictions for both felony murder and the predicate felony constitute a double jeopardy violation; (5) the trial court erred in enhancing his convictions for use of a firearm; (6) causing death by shooting at a dwelling is not a crime one can conspire to commit; (7) the trial court erred in submitting to the jury a second degree murder instruction that failed to incorporate accessory language; and (8) his convictions are not supported by sufficient evidence. We conclude the State properly relied on Section 30–3–8 in charging Defendant with felony murder, but that Defendant's right to be protected from double jeopardy was violated by his convictions for both felony murder and shooting at a dwelling. We also conclude that firearm enhancement on these facts is improper multiple punishment. Defendant's other claims provide no basis for reversal.

We affirm his convictions for felony murder and conspiracy, vacate his conviction for shooting at a dwelling, and remand for resentencing.

## I.

{2}  On July 31, 1996, just before midnight, someone fired several rounds into a mobile home in Silver City. After firing the shots, the persons responsible sped off in a car. One round hit Louis Martinez, the owner, as he slept. Louis Martinez got out of bed, turned on the light, and collapsed in an attempt to call 911. He died shortly thereafter.

{3}  The police received a number of telephone tips, one of which led to Ruben Olivas. Olivas eventually admitted to having been in the car, identified Defendant as the driver, and identified two other young men, Jaime Perez and Michael Gonzales, as passengers. Defendant was twenty-seven years old. Olivas, Perez, and Gonzales were between the ages of fourteen and seventeen. Olivas, Perez, and Gonzales all admitted to participating in the incident. Defendant maintained he was home with family and friends the night of the shooting.

{4}  The State argued that all four men were members of the Chinatown Locos (CTL), a local gang. CTL had been in conflict with the Folk gang, to which Nick Martinez, Louis Martinez's son, belonged. The State reasoned that the shooter fired into the trailer in response to an earlier confrontation between Nick Martinez and Gonzales. The three younger men admitted to being members of CTL; Defendant testified he was not. Four admitted members of CTL, Perez, and Gonzales testified that Defendant was not a member of CTL. A "gang expert" testified gang members often lie to law enforcement to protect other gang members.

{5}  Olivas testified for the State that he, Defendant, Perez, and Gonzales were all members of CTL at the time of the shooting and that they had spent the evening of July 31 together, drinking beer and cruising. At some point, they picked up a shotgun and shells and went to Little Walnut picnic ground. There Defendant suggested a "jale"

or job. The group drove to the Martinez home, fired four shots into the trailer, and then sped off.

{6}  The State called Gonzales to testify as a hostile witness and questioned him about a prior written statement he had given to the police, which identified "Archie" as the driver. Gonzales denied any memory of writing the statement, but he said its content was accurate. At the conclusion of Gonzales' testimony, Defendant moved for a mistrial or, in the alternative, to strike the testimony on the grounds that the State called Gonzales merely to impeach him. The trial court denied the motion. When Detective Villegas, who allegedly witnessed the statement, subsequently testified, the trial court admitted the statement itself. Defendant objected on the ground it was inadmissible hearsay.

{7}  Perez also testified for the State. He testified "some other guy," not Defendant, was driving the car. Perez admitted he shot the gun in order to get even with Nick Martinez. He also admitted he had previously told the police the driver was Archie Varela, but he insisted the earlier statement was a result of police harassment.

{8}  The trial court instructed the jury, based on UJI 14–341 NMRA 1999, on the following felony as predicate for felony murder:

> For you to find the defendant guilty of causing death by Shooting at a Dwelling as an Accessory charged in Count 2, the State must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1.  The defendant helped, encouraged, or caused another to willfully shoot a firearm at a dwelling;
> 2.  The defendant knew that the building was a dwelling;
> 3.  The defendant caused the death of Louis Martinez;
> 4.  This happened in New Mexico on or about the 31st day of July, 1996.

There was no objection.

{9}  The trial court instructed the jury on felony murder, depraved mind murder, and second degree murder. The jury found Defendant guilty of accessory to first degree

felony murder, accessory to shooting at a dwelling, and conspiracy to commit shooting at a dwelling. The jury also found that a firearm was used in the commission of second degree murder and shooting at a dwelling. Defendant was sentenced to life imprisonment plus eighteen years which included two, one-year firearm enhancements and two enhancements pursuant to the Habitual Offender Act. *See* NMSA 1978, § 31–18–17(D) (1993).

## II.

■■■ {10} NMSA 1978, § 30–3–8(A) (1993) provides:

Shooting at a dwelling or occupied building consists of willfully discharging a firearm at a dwelling or occupied building. Whoever commits shooting at a dwelling or occupied building that does not result in great bodily harm to another person is guilty of a fourth degree felony. Whoever commits shooting at a dwelling or occupied building that results in injury to another person is guilty of a third degree felony. Whoever commits shooting at a dwelling or occupied building that results in great bodily harm to another person is guilty of a second degree felony.

Defendant contends that Section 30–3–8(A), properly construed, does not include a shooting at a dwelling that results in death. Section 30–3–8(A) does not mention "causing death" and death is not included as a type of "great bodily harm" as that term is defined by NMSA 1978, § 30–1–12(A) (1963). He argues the crime for which he was convicted was intended to be prosecuted only as a homicide rather than as a felony or as felony murder. Defendant's arguments raise questions of law, which we review de novo. *See State v. Rowell*, 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995).

■■■ {11} Ordinarily a defendant may not base a claim of error on instructions he or she requested or to which he or she made no objection. *See State v. Noble*, 90 N.M. 360, 365, 563 P.2d 1153, 1158 (1977). Defendant argues on appeal that the jury instructions incorrectly stated the law and resulted in fundamental error. We agree with Defendant that fundamental error need not be preserved. "An exception to the general rule barring review of questions not properly preserved below ... applies in cases which involve fundamental error. Fundamental error cannot be waived." *State v. Osborne*, 111 N.M. 654, 662, 808 P.2d 624, 632 (1991) (quoting *State v. Clark*, 108 N.M. 288, 296, 772 P.2d 322, 330 (1989), *habeas corpus relief granted on other grounds by Clark v. Tansy*, 118 N.M. 486, 492–93, 882 P.2d 527, 533–34 (1994)). We agree with Defendant that it would be fundamental error to substitute "death" for "great bodily harm" if the legislature did not intend for a shooting at a dwelling that results in death to be prosecuted under Section 30–3–8. Nevertheless, we do not believe any error occurred.

■■■ {12} Section 30–1–12(A) defines great bodily harm as "an injury to the person which creates a high probability of death; or which causes serious disfigurement; or which results in permanent or protracted loss or impairment of the function of any member or organ of the body." The trial court instructed the jury pursuant to a uniform jury instruction promulgated by this Court. *See* UJI 14–341 NMRA 1999. Defendant challenges the jury instruction's equation of "death" and "great bodily harm." He argues the Legislature did not equate the two terms and the jury instruction incorrectly stated the law by authorizing a conviction under Section 30–3–8 for "causing death."

{13} Defendant's argument requires a strained construction of Section 30–3–8.

The main goal of statutory construction is to give effect to the intent of the legislature. To do this, we look to the object the legislature sought to accomplish and the wrong it sought to remedy. The words of a statute ... should be given their ordinary meaning, absent clear and express legislative intention to the contrary....

*Rowell*, 121 N.M. at 114, 908 P.2d at 1382 (citations and internal quotation marks omitted). We note that the first sentence of Section 30–3–8 appears to prohibit any shooting at a dwelling or occupied building. This sentence indicates that the wrong the legislature sought to remedy is any shooting at a dwelling or occupied dwelling. The next

three sentences assign a level of punishment to three different fact patterns: a shooting at a dwelling or building that does not result in great bodily harm; one that results in injury to another person; and one that results in great bodily harm. *See* § 30–3–8. If we construe the first sentence according to its terms, as prohibiting any shooting at a dwelling or occupied building, then the circumstance in which the shooting results in death must be viewed as falling into one of the three levels of punishment. "[O]ur construction must not render the statute's application absurd, unreasonable, or unjust." *Aztec Well Servicing Co. v. Property & Cas. Ins. Guar. Ass'n,* 115 N.M. 475, 479, 853 P.2d 726, 730 (1993). To construe the statute as not including situations in which the victim dies would render Section 30–3–8's application absurd.

{14} An injury that causes death, surely often, if not always, causes a high probability of death. *Cf. State v. Keyonnie,* 91 N.M. 146, 148, 571 P.2d 413, 415 (1977) (stating, in a different context, "as a matter of common sense … death clearly and exclusively falls within the definition of 'great bodily harm'"). In this case, for example, Louis Martinez suffered an injury that created a high probability of death and in fact caused his death. We conclude that Sections 30–3–8 and 30–1–12(A), taken together, support a conclusion that the Legislature equated "causing death" and "great bodily harm." Therefore, we also conclude the jury instruction correctly stated the law.

■ {15} Defendant also argues that causing death by shooting at a dwelling does not meet the requirement under *State v. Harrison* that the underlying felony be an independent, or a collateral, felony. 90 N.M. 439, 441, 564 P.2d 1321, 1323 (1977), *superseded in part by rule on other grounds as stated in State v. Corneau,* 109 N.M. 81, 87, 781 P.2d 1159, 1165 (Ct.App.1989). In *Harrison,* we placed three limitations on the felony murder doctrine:

(1) [T]here must be a causal relationship between the felony and the homicide, (2) the felony must be independent of or collateral to the homicide, and (3) the felony must be inherently or foreseeably dangerous to human life.

*Id.* The first and third elements are clearly met. Defendant argues that the second requirement was not met; he contends the felony was not independent or collateral to the homicide.

■ {16} We recently addressed the felony murder doctrine and the requirement of an independent felony in *State v. Campos,* 1996–NMSC–043, 122 N.M. 148, 921 P.2d 1266, and *State v. Duffy,* 1998–NMSC–014, 126 N.M. 132, 967 P.2d 807. In *Campos,* we noted that "the vast majority of homicides are predicated on an initial felonious assault or battery." 1996–NMSC–043, ¶ 10, 122 N.M. 148, 921 P.2d 1266. We were concerned that most second degree murders might be charged as first degree murders. The underlying assaultive act would be a proper predicate felony for felony murder doctrine, absent some limitation on the range of appropriate felonies. *Id.* ¶ 19. We precluded that possibility by adopting a collateral felony doctrine. Under the New Mexico collateral felony doctrine, the predicate felony cannot be a lesser included offense of second degree murder. *See id.*

{17} In order to determine what is a lesser included offense of second degree murder, in *Campos* we applied a strict elements test[1]. This test provides a tool for determining legislative intent, and

the purpose of the collateral-felony limitation to the felony-murder doctrine is to further the legislative intent of holding certain second-degree murders to be more culpable when effected during the commission of a felony—thereby elevating them to first-degree murders—while maintaining the important distinction between classes of second- and first-degree murders.

*Id.* ¶ 22. We further held that when there is more than one statutory definition of the

---

**1.** We recognize, as did *Campos,* that this test is distinct from the test to determine whether a lesser included instruction should be submitted to the jury. *See id.* ¶ 21. Under some circum-

stances, shooting at a dwelling might be a lesser included offense of second degree murder. *See State v. Meadors,* 121 N.M. 38, 44, 908 P.2d 731, 737 (1995).

requisite felony, "the correct inquiry is whether it is possible to commit second degree murder without committing some form of the dangerous felony." *Id.* ¶ 23. Under this analysis, it would be impossible to be convicted of felony murder if the underlying felony was aggravated assault or aggravated battery because it would be impossible to commit second degree murder without committing some form of both aggravated assault and aggravated battery. *See id.* This is true despite the fact that some statutory definitions of aggravated assault and aggravated battery may include one or more statutory elements that are not elements of second degree murder. *See id.* Finally, we held this test is to be applied in the abstract. *See id.*

{18} Applying a strict elements test in this case, we conclude that shooting at a dwelling is not a lesser included offense of second degree murder. The crime of shooting at a dwelling requires willfully shooting at a dwelling, which is not an element of second degree murder. The crime of second degree murder requires that a defendant know that his or her acts create a strong probability of death or great bodily harm; shooting at a dwelling does not contain a similar mens rea. Since there is not more than one statutory definition of the requisite felony, there is no need to apply the alternative test prescribed in *Campos. See id.*

{19} Defendant contends that *Campos* did not establish a single method for establishing legislative intent. He further contends that under *Campos* legislative intent must be determined and that a strict elements test is often, but not always, an effective mechanism. Defendant relies on *Duffy* for the proposition that in "most circumstances" a strict elements test answers the question of legislative intent. 1998–NMSC–014, ¶ 24, 126 N.M. 132, 967 P.2d 807. In urging this Court to look to other legislative indicia, Defendant reasons that the legislature would not have created an automatic instance of felony murder without a more express statement of its intent. Defendant argues every instance of causing death by shooting at a dwelling is per se felony mur-

der. Defendant's argument is not persuasive.

{20} In order to prevent the first degree murder mens rea requirement from being swallowed up by the felony murder doctrine, *Campos,* 1996–NMSC–043, ¶ 10, 122 N.M. 148, 921 P.2d 1266 New Mexico imposes a mens rea requirement for a felony murder conviction. *See State v. Ortega,* 112 N.M. 554, 563, 817 P.2d 1196, 1205 (1991). "[T]he felony-murder doctrine in New Mexico does not abandon the mens rea requirement for murder, nor does it create a presumption that a defendant had intended to kill whenever a homicide occurs during the course of a felony." *Campos,* 1996–NMSC–043, ¶ 17, 122 N.M. 148, 921 P.2d 1266. Our felony murder doctrine raises second degree murder to first degree when the murder is committed in the course of a dangerous felony with the requisite mens rea. *See id.* Thus, for the doctrine to apply, the State must prove the elements of second degree murder as well as an independent felony. *See id.* ¶ 19. Under this doctrine, we avoid the risk that a person committing a negligent or accidental killing will be convicted of felony murder, because a negligent or accidental killing does not constitute second degree murder. *See id.* ¶ 18.

{21} In this case, the evidence supports a finding that Defendant acted with the necessary mens rea. The jury could have found he knew shooting into a mobile home, in which several people lived, created a strong probability of death or great bodily harm. *See* NMSA 1978, § 30–2–1(B) (1963). It does not follow, however, that every instance of shooting at a dwelling which results in death is automatically felony murder. If a defendant shoots into a dwelling, believing it to be abandoned, and kills an occupant, then he or she would be guilty of the felony, but would not necessarily be guilty of felony murder. In such a fact pattern, a jury might find the requisite mens rea for second degree murder absent, precluding a conviction for felony murder.

### III.

{22} Defendant also argues that the trial court erred in admitting a portion of the

testimony of the State's "gang expert." Relying on *State v. Alberico,* he argues that the expert invaded the province of the jury by testifying about witness credibility. 116 N.M. 156, 175, 861 P.2d 192, 211 (1993).

{23} Defendant made three objections at trial. The initial objection he made was not an objection to specific testimony, but rather an argument that the trial court should not allow the expert to testify. Defendant argued that the expert would rely on characteristics of other gangs to impeach and impugn his character and that of local gang members who might testify on his behalf. The court allowed the expert to testify after ruling that the testimony would cover only general gang characteristics.

{24} The expert began his testimony describing general characteristics of gangs. Eventually, the prosecutor asked him what a gang member typically does with respect to revealing the identify of other gang members. At this point, Defendant objected stating, "Calling this witness [unintelligible] the credibility of other witnesses is irrelevant." The objection was overruled. The witness answered that a gang member's cooperation with law enforcement is minimal. The witness noted that a gang member does not want to be labeled an informant and has a duty to protect older members. Defendant then, without stating a basis, objected "to each and every question." When asked if there was anything to indicate a difference between local and other gangs, the expert answered in the negative.

{25} In order to preserve an error for appeal, "it is essential that the ground or grounds of the objection or motion be made with sufficient specificity to alert the mind of the trial court to the claimed error or errors, and that a ruling thereon then be invoked." *State v. Lopez,* 84 N.M. 805, 809, 508 P.2d 1292, 1296 (1973). In this case, Defendant objected three times to the expert testimony. The second, more specific, objection apparently was one of relevancy. On appeal Defendant argues that the probative value of the testimony was outweighed by its prejudicial effect. That is a different objection; it identifies a problem the trial court might have required the State to avoid

had Defendant asked the court to consider Rule 11–403 NMRA 1999.

{26} Perhaps when he referred to "credibility" Defendant intended to raise the issue of prejudice. A specific request that a court balance probative value of evidence against prejudicial effect is not required to preserve an issue for appeal if the court is otherwise aware that it must compare the two. *See State v. Conn,* 115 N.M. 101, 104, 847 P.2d 746, 749 (Ct.App.1992). Neither the court nor the State, however, gave any indication they understood the Defendant's objection to raise the issue. In fact, the prosecutor offered to prove relevance. We conclude this issue was not properly preserved for appeal. "The court had no opportunity to consider the merits of, or to rule intelligently on, the argument defendant now puts before us." *State v. Lucero,* 104 N.M. 587, 590, 725 P.2d 266, 269 (Ct.App.1986).

## IV.

{27} Defendant makes two arguments regarding the testimony of Michael Gonzales. First, he contends the trial court erred in denying his motion for mistrial or in refusing to strike the testimony, because the State allegedly called Gonzales solely to impeach him. Second, he argues the trial court erred in admitting written hearsay attributed to Gonzales.

{28} "Since the granting of a mistrial is discretionary with the trial court, we will not disturb the decision on appeal absent an abuse of discretion." *State v. Sutphin,* 107 N.M. 126, 130, 753 P.2d 1314, 1318 (1988). "Abuse of discretion exists when the trial court acted in an 'obviously erroneous, arbitrary, or unwarranted' manner." *State v. Stills,* 1998–NMSC–009, ¶ 33, 125 N.M. 66, 957 P.2d 51 (quoting *Alberico,* 116 N.M. at 170, 861 P.2d at 206).

{29} Defendant is correct that it is improper to call an opposing party's witness for the sole purpose of impeachment.

Case law from other jurisdictions supports the proposition that it is entirely inappropriate for the prosecution to call a witness who is favorable to the defendant only to

elicit statements made to the witness by a defendant, because such a scheme operates as a subterfuge to avoid the hearsay rule. *State v. Duran,* 107 N.M. 603, 606, 762 P.2d 890, 893 (1988), *superseded by rule on other grounds as stated in State v. Gutierrez,* 1998–NMCA–172, ¶ 10, 126 N.M. 366, 969 P.2d 970. We also held, however, that "[i]f the prosecution elicits relevant, substantive testimony from the witness, it may impeach its witness with prior inconsistent statements about the same matter being testified to at trial." *Duran,* 107 N.M. at 607, 762 P.2d at 894.

{30} Gonzales' testimony, in large part, corroborated that of Olivas. Gonzales' testimony provided significant relevant substantive evidence in support of the State's case. The only actual impeachment occurred when Gonzales' account differed from that of Olivas. The differences were: Gonzales' assertions that it was not the Defendant who drove the car, but rather Archie Barela, where the participants were seated in the car, and that Olivas, not Perez, fired the shots. Otherwise, the testimony can best be characterized as an effort to elicit testimony from an uncooperative witness. In addition, Gonzales' attempt to convince the jury that it was a third person who drove the car supported the State's theory that Perez and Gonzales agreed to protect Defendant, as fellow gang members, by implicating another. For these reasons, we conclude the trial court did not abuse its discretion in denying Defendant's motion.

{31} Defendant also contends the court erred in admitting into evidence the written hearsay statement attributed to Gonzales through Detective Villegas' testimony. The State argued that Gonzales had testified to a lack of memory regarding the events detailed in the statement and, therefore, was unavailable under Rule 11–804(A)(3) NMRA 1999, and the statement was admissible under one of two exceptions to the hearsay rule: as a statement against penal interest or under the residual or catchall exception. Defendant maintained the statement was not admissible, but argued if the trial court admitted the statement as against penal interest, the sections implicating him were not

against Gonzales' penal interest and requested a redaction. The trial court refused to redact, admitted the entire statement into evidence as against penal interest, and also suggested the statement was inconsistent with Gonzales' trial testimony and was therefore admissible to impeach his credibility. We examine both bases for the ruling.

{32} In order for a hearsay statement to be admissible under Rule 11–804(B)(3) NMRA 1999, the exception to the hearsay rule for statements against penal interest, the declarant must first be unavailable. Rule 11–804(A) defines unavailability as including five situations. Rule 11–804(A)(3) states that "'[u]navailability as a witness' includes situations in which the declarant ... testifies to a lack of memory of the subject matter of the declarant's statement." *See State v. Torres,* 1998–NMSC–052, ¶ 8, 126 N.M. 477, 971 P.2d 1267.

{33} "Admission or exclusion of evidence is a matter within the discretion of the trial court and the court's determination will not be disturbed on appeal in the absence of a clear abuse of that discretion." *State v. Valdez,* 83 N.M. 632, 637, 495 P.2d 1079, 1084 (Ct.App.1972). While "[t]he trial court has discretion to determine whether the burden of showing unavailability [of a witness] has been met [and][t]he ruling of the trial court will not be disturbed absent a showing of abuse of that discretion," *State v. Smith,* 92 N.M. 533, 539, 591 P.2d 664, 670 (1979), we agree with the Defendant that the trial court erred in determining Gonzales was "unavailable" within the meaning of Rule 11–804(A).

{34} In *State v. Maestas,* we held "the crucial factor [in the employment of this rule] is not the unavailability of the witness, but rather the unavailability *of his/her testimony*." 92 N.M. 135, 141, 584 P.2d 182, 188 (Ct.App.1978). Rule 11–804(A)(3) mirrors the Federal Rules of Evidence. *See* Fed. R.Evid. 804(a)(3). According to *Federal Evidence,* "[T]he important point [of the unavailability requirement] is the state of the recollection of the declarant about the underlying realities described or asserted in her prior statement. The fact that she either does or does not remember making her statement

does not bear on the question at hand." 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 483, at 737 (2d ed.1994). In this case, Gonzales' testimony did not reflect a lack of memory as to the subject matter, but rather as to the making of the statement. In general, he confirmed the events described in the statement and clarified which "Archie" the statement identified. The trial court, in fact, observed, "He's testified to most of this anyway." When a witness testifies consistently with the substance of a prior written statement, but fails to recall writing the statement, the witness is not unavailable within the meaning of Rule 11–804(A).

{35} Defendant also argues the trial court was under an obligation to redact any statements which were not against Gonzales' penal interest. We need not address this issue. The statement was not admissible under Rule 11–804(A)(3).

{36} The statement was also not admissible under Rule 11–613(B) NMRA 1999, which allows admission of prior inconsistent statements of witnesses. Under Rule 11–613(B) the statement introduced into evidence must be inconsistent with trial testimony. When there are inconsistencies, the statement as a whole can be admitted without the state showing an inconsistency as to each and every statement. *See State v. Gonzales*, 113 N.M. 221, 228, 824 P.2d 1023, 1030 (1992). This does not mean whenever a witness does not remember making a statement the entire statement is admitted into evidence; there must be substantive inconsistencies. Gonzales' trial testimony was, in general, not inconsistent with his prior statement.

{37} Nevertheless, "not all erroneously admitted evidence necessitates reversal." *State v. Woodward*, 121 N.M. 1, 9, 908 P.2d 231, 239 (1995). The error must be prejudicial. *See id.* at 10, 908 P.2d at 240. "In the absence of prejudice, there is no reversible error." *State v. Hoxsie*, 101 N.M. 7, 10, 677 P.2d 620, 623 (1984), *overruled on other grounds by Gallegos v. Citizens Ins. Agency*, 108 N.M. 722, 779 P.2d 99 (1989). Under Rule 11–103(A) NMRA 1999, "[e]rror may not be predicated upon a ruling which

admits or excludes evidence unless a substantial right of the party is affected." In this case, the statement provided evidence cumulative of Gonzales' testimony, and therefore its admission does not provide a ground for reversal. *See Davis v. Davis*, 83 N.M. 787, 789, 498 P.2d 674, 676 (1972).

## V.

{38} Defendant also contends that if his conviction of felony murder is affirmed, his conviction of shooting at a dwelling must be vacated, because the two convictions are based on unitary conduct. In *State v. Contreras*, we held that consecutive sentences for felony murder and the underlying felony violate the Double Jeopardy Clause when based on unitary conduct. 120 N.M. 486, 490, 903 P.2d 228, 232 (1995). "Conduct is separate and distinct and not unitary if 'events are sufficiently separated by either time or space,' or 'the quality and nature of the acts or ... the objects or results involved' are distinguishable." *Id.* at 490, 903 P.2d at 232 (quoting *Swafford v. State*, 112 N.M. 3, 13–14, 810 P.2d 1223, 1233–34 (1991)) (citation omitted) (omission in original). Under *Contreras*, the reviewing court looks at the facts of the case to determine whether the conduct is unitary. *See id.* at 490, 903 P.2d at 232.

{39} In this case, the incident in question involved four shots fired in rapid succession. *Gonzales*, which involved a first degree murder and shooting into a motor vehicle, held that "multiple gun shots ... [fired] in rapid succession" constituted unitary conduct "[b]ecause the shots were not 'separated by either time or space.'" 113 N.M. at 224, 824 P.2d at 1026. The State argues that in this case the first three shots into the trailer, which did not injure anyone, had different objects and results than the final shot which killed Louis Martinez. The State argues the object and the result of the first three shots was intimidation of Nick Martinez, who was not in the trailer; the fourth shot killed Louis Martinez. In our view, while the result might be different, the object was the same. The difference in result is not a sufficient basis to distinguish *Gonzales*.

{40} When the conduct is unitary and the legislature does not expressly authorize multiple punishments, we apply a strict elements test. *See Contreras,* 120 N.M. at 490, 903 P.2d at 232. We held in *Contreras* that the defendant "could not have been convicted of felony murder unless the State proved all of the elements of [the underlying felony]; the elements of [the underlying felony] thus are subsumed by the elements of felony murder in the course of [the underlying felony]." *Id.* Because the elements of shooting at a dwelling are subsumed by the felony murder conviction there is no need to look to other indicia of legislative intent. *See id.* at 490–91, 903 P.2d at 232–33. We conclude Defendant's convictions for shooting at a dwelling and felony murder violate his right to be free from double jeopardy. Therefore, Defendant's conviction for shooting at a dwelling is vacated.

## VI.

{41} On appeal the State concedes, and we agree, the firearm enhancements of sentences for the crimes of shooting into a dwelling and felony murder with a predicate felony of shooting at a dwelling constitute double jeopardy because the use of a firearm is an element of the crimes. *See State v. Elmquist,* 114 N.M. 551, 555, 844 P.2d 131, 135 (Ct.App.1992). Under *Elmquist,* the enhancements must be vacated.

## VII.

{42} Defendant argues his conspiracy conviction was improper. Conspiracy is a specific intent crime. *See State v. Baca,* 1997–NMSC–059, ¶ 51, 124 N.M. 333, 950 P.2d 776. In order to be convicted of conspiracy, the defendant must have the requisite intent to agree and the intent to commit the offense that is the object of the conspiracy. *See id.* In *Baca,* the Court held under the current depraved mind murder case law, the defendant could not be found to have intended to kill and simultaneously to have disregarded the risk of death. *See id.* ¶ 52. Defendant argues the same theory applies to shooting at a dwelling when an element of the offense was "causing death," because that element would require culpability amounting to recklessness. Defendant, however, was convicted of conspiracy to commit shooting at a dwelling, not conspiracy to commit causing death by shooting at a dwelling. The requisite culpability of the crime of shooting at a dwelling, as stated in Section 30–3–8 and repeated in the jury instruction, is willful, not reckless, behavior. Under New Mexico law, willful conduct is conscious or intentional conduct. *See Rio Grande Gas Co. v. Gilbert,* 83 N.M. 274, 276, 491 P.2d 162, 164 (1971). Defendant was convicted of a crime that required more than recklessness. Defendant was properly convicted of conspiracy to commit that crime.

## VIII.

{43} Defendant complains that the second degree murder instruction, unlike the felony murder and depraved mind murder instruction, failed to include the accessory language of "helped, encouraged, or caused another to cause." He contends the court's instruction precluded the jury from considering a conviction of a lesser degree of murder. Defendant did not object to the instruction; therefore we review for fundamental error.

{44} The trial court instructed the jury on felony murder, depraved mind murder, and second degree murder. The felony murder and depraved mind murder instructions both contained, within the elements, the language: "The defendant ... helped, encouraged, or caused." The uniform jury instructions contain a special instruction incorporating accessory liability into the felony murder instruction. *See* UJI 14–2821 NMRA 1999. The uniform jury instructions, however, do not provide a similar instruction for crimes other than felony murder, but rather include a general instruction, which is to be given separately. *See* UJI 14–2822 NMRA 1999. In this case, the jury was given an accessory instruction consistent with the uniform jury instructions. Both the depraved mind murder and felony murder instructions incorporated accessory language. Defendant asserts that because both the felony murder and depraved mind murder instructions incorporated the language "helped, encouraged, or caused" and the second degree murder did not, a reasonable

jury might believe there was a higher level of culpability for second degree murder than felony murder or depraved mind murder.

{45} We find Defendant's arguments unpersuasive. The instruction for second degree murder stated in its introductory paragraph, "For you to find the defendant guilty as an *accessory* to Second Degree Murder as an included offense of Count 1, *even though the defendant did not commit the murder*, the State must prove . . . ." (emphasis added). In addition, the jury was given the appropriate, separate accessory instruction. *See* UJI 12–2822. We believe the introductory paragraph of the second degree murder instruction and the separate accessory instruction adequately informed the jury. No error occurred.

## IX.

{46} Finally, Defendant argues the evidence at trial was insufficient to support his convictions for shooting at a dwelling, felony murder, and conspiracy. We will review the sufficiency of the evidence in order " 'to ensure that . . . a rational jury could have found beyond a reasonable doubt the essential facts required for a conviction.' " *State v. Rojo*, 1999–NMSC–001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (quoting *Baca*, 1997–NMSC–059, ¶ 13, 124 N.M. 333, 950 P.2d 776). "We view the evidence in the light most favorable to supporting the verdict and resolve all conflicts and indulge all inferences in favor of upholding the verdict." *State v. Hernandez*, 115 N.M. 6, 26, 846 P.2d 312, 332 (1993).

{47} Defendant contends that in order to find him guilty the jury would have had to believe Olivas' testimony and notes that his version of the facts changed frequently. Under our case law, the fact finder determines credibility. *See State v. Roybal*, 115 N.M. 27, 30, 846 P.2d 333, 336 (Ct.App.1992). We are not persuaded that the jury could not have believed Olivas or that his testimony was inherently incredible. The State introduced sufficient evidence to satisfy the ultimate standard of due process.

## X.

{48} Defendant was charged and convicted of shooting at a dwelling. He was separately charged and convicted of felony murder. He has not shown fundamental error in either conviction. He has not shown reversible error in the trial court's evidentiary rulings or jury instructions, nor has he shown that there was insufficient evidence to support his convictions. He has shown that his sentences, in part, violate his right to be free from double jeopardy. For the foregoing reasons, we affirm Defendant's convictions for felony murder and conspiracy, vacate his conviction for shooting at a dwelling, and also vacate the firearm enhancements. We remand for resentencing.

{49} **IT IS SO ORDERED.**

BACA, FRANCHINI, SERNA and MAES, JJ., concur.